

FILED by **JA** D.C.

Mar 23, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## 22-80039-CR-CANNON/REINHART

Case No. _____

18 U.S.C. § 371
18 U.S.C. § 982

UNITED STATES OF AMERICA

vs.

STEVEN GOLDBERG,

        **Defendant.**
_____/

### INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

### Medicare Program

1.    The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.    Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States

Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

6. Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health

care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Cancer Genomic Tests

7. Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

8. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

9. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

10. Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

### Telemedicine

11. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

12. Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

13. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

### The Defendant and Related Entities

14. Laboratory 1, a limited liability company formed under the laws of New Jersey, was a laboratory that purportedly provided CGx testing to beneficiaries.

15. Laboratory 2, a limited liability company formed under the laws of New Jersey, was a laboratory that purportedly provided CGx testing to beneficiaries.

16. LabSolutions, LLC ("LABSOLUTIONS"), a limited liability company formed under the laws of Georgia, was a laboratory that purportedly provided CGx testing to beneficiaries.

17. CPL Media Group, Inc. ("CPL"), a company incorporated under the laws of Florida, was a telemarking company.

18. Medipak, LLC ("MEDIPAK"), a limited liability company formed under the laws of Florida and doing business under the name CPL (CPL and MEDIPAK are collectively referred to herein as the "CPL ENTITIES"), was a telemarketing company.

19. Medtech Worldwide, Inc. ("MEDTECH"), a company incorporated under the laws of Florida, was a telemedicine company.

20. Real Time Physicians, LLC ("REAL TIME"), a limited liability company formed under the laws of Nevada, was a telemedicine company.

21. 24 HR Virtual MD, LLC ("24 HR"), a limited liability company formed under the laws of Florida, was a telemedicine company.

22. Defendant **STEVEN GOLDBERG**, a resident of Palm Beach County in the Southern District of Florida, was the nominee owner, manager, and operator of the CPL ENTITIES, MEDTECH, REAL TIME, and 24 HR.

**Conspiracy to Pay and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

23. From in or around January 2017, and continuing through in or around April 2021, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**STEVEN GOLDBERG,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate and agree with others, known and unknown to the United States Attorney, to commit offenses against the United States, that is:

5

a. to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A) and (b)(2)(A), by soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

b. to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

**Purpose of the Conspiracy**

24. It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by: (a) soliciting and receiving kickbacks and bribes in return for recruiting and referring beneficiaries, CGx tests, and doctors' orders for CGx tests and other documentation necessary to submit claims to Medicare (collectively, "doctors' orders") to laboratories, including LABSOLUTIONS, Laboratory 1, and Laboratory 2; (b) offering and paying kickbacks and bribes to physicians in exchange for doctors' orders for CGx tests; (c) submitting and causing the submission of claims to Medicare for CGx tests that laboratories, including LABSOLUTIONS, Laboratory 1, and Laboratory 2, purported to provide to those Medicare beneficiaries; (d) concealing the payment and receipt of kickbacks and bribes; and (e) diverting proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

25. **STEVEN GOLDBERG** and other co-conspirators agreed, through contracts and otherwise, to receive kickbacks and bribes as payments from laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS, to the CPL ENTITIES for marketing services. In some of the contracts, the laboratories agreed to pay **GOLDBERG**, through the CPL ENTITIES, as much as 45% of the gross revenues paid by Medicare in exchange for his recruitment and referral of beneficiaries, CGx tests, and doctors' orders to the laboratories for CGx testing, regardless of whether the CGx tests were medically necessary or eligible for Medicare reimbursement.

26. **STEVEN GOLDBERG** and other co-conspirators, through the CPL ENTITIES, recruited thousands of Medicare beneficiaries by targeting them with telemarketing campaigns and inducing them to accept CGx tests regardless of whether the tests were medically necessary or eligible for Medicare reimbursement.

27. **STEVEN GOLDBERG** and other co-conspirators offered and paid kickbacks and bribes to telemedicine providers through their telemedicine companies, including MEDTECH, REAL TIME, and 24 HR, in exchange for doctor's orders for CGx tests that were not medically necessary and not eligible for Medicare reimbursement. The orders were written by providers that contracted with the telemedicine companies, including MEDTECH, REAL TIME, and 24 HR, even though the doctors who wrote the orders had no prior relationship with the beneficiaries, were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, and did not conduct a proper telemedicine visit.

28.     **STEVEN GOLDBERG** and other co-conspirators caused laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS, to submit false and fraudulent claims to Medicare for CGx tests that were: (a) induced through kickbacks and other illicit incentives; (b) designed for maximum reimbursement and regardless of medical need; (c) not medically necessary; (d) not eligible for reimbursement; and (e) not properly prescribed by a doctor (i) treating the beneficiary for cancer or symptoms of cancer, (ii) using the results in the treatment of the beneficiaries, or (iii) having a legitimate physician-patient relationship with the beneficiary.

29.     As a result of these false and fraudulent claims, Medicare made payments to laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS. Laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS, then paid kickbacks to **STEVEN GOLDBERG**, through the CPL ENTITIES.

30.     **STEVEN GOLDBERG** and other co-conspirators used the fraud proceeds received from laboratories, including Laboratory 1, Laboratory 2, and LABSOLUTIONS, to benefit themselves and others, and to further the conspiracy.

### Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.     On or about December 1, 2017, **STEVEN GOLDBERG** signed an agreement to receive kickbacks and bribes as payments from LABSOLUTIONS to the CPL ENTITIES for marketing services. In the agreement, LABSOLUTIONS agreed to pay **GOLDBERG**, through the CPL ENTITIES, 45% of the gross revenues paid by Medicare in exchange for the CPL ENTITIES recruitment and referral of beneficiaries.

2.  On or about February 15, 2018, LABSOLUTIONS wired the CPL ENTITIES $151,555.91 pursuant to the December 1, 2017 agreement. This payment constituted a kickback payment made in return for beneficiary referrals.

3.  On or about March 1, 2018, LABSOLUTIONS wired the CPL ENTITIES $174,773.35 pursuant to the December 1, 2017 agreement. This payment constituted a kickback payment made in return for beneficiary referrals.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE

1.  The allegations of this Information are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **STEVEN GOLDBERG**, has an interest.

2.  Upon conviction of a conspiracy to commit a violation of Title 42, United States Code, Section 1320a-7b, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission such offense, pursuant to Title 18, United States Code, Section 982(a)(7).

All pursuant to Title 18, United States Code, Section 982(a)(7) and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

JOSEPH S. BEEMSTERBOER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

LIGIA MARKMAN
TRIAL ATTORNEY
REGINALD CUYLER JR.
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION,
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

STEVEN GOLDBERG,

        Defendant.       /

CASE NO._____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division:** (Select One)

- ☐ Miami
- ☐ Key West
- ☐ FTL
- ☑ WPB
- ☐ FTP

New defendant(s) ☐ Yes ☐ No
Number of new defendants _____
Total number of counts _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) **No**
   List language and/or dialect _____

4. This case will take **0** days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)
   - I   0 to 5 days ☑
   - II  6 to 10 days ☐
   - III 11 to 20 days ☐
   - IV  21 to 60 days ☐
   - V   61 days and over ☐

   (Check only one)
   - Petty ☐
   - Minor ☐
   - Misdemeanor ☐
   - Felony ☑

6. Has this case previously been filed in this District Court? (Yes or No) **No**
   If yes: Judge _____ Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) **No**
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____
   Is this a potential death penalty case? (Yes or No) **No**

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)? (Yes or No) **No**

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) **No**

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)? (Yes or No) **No**

_____
LIGIA MARKMAN
DOJ Trial Attorney
Court ID No.    A5502656

*Penalty Sheet(s) attached

REV 3/19/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**       STEVEN GOLDBERG

**Case No:** _____

Count #: 1

  Title 18, United States Code, Section 371

  Conspiracy to Pay and Receive Health Care Kickbacks

**\*Max Penalty**:   Five (5) years imprisonment, $250,000 fine or twice gross gain or loss resulting from the offense, supervised release 3 years, special assessment $100, restitution, and criminal forfeiture.

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| | ) | |
| Steven Goldberg, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*